IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

APR - 4 2005    KM

Michael N. Milby, Clerk

| | | |
|---|---|---|
| WESTBORO PROPERTIES, LLC | § | |
| and STONEHURST CAPITAL, INC. | § | |
| | § | |
| VS. | § | C.A. NO. _____ |
| | § | |
| CANADIAN IMPERIAL BANK OF | § | JURY DEMANDED |
| COMMERCE; CIBC INC.; CIBC | § | |
| WORLD MARKETS CORP.; and | § | |
| CIBC CAPITAL CORP. | § | |

# H-05-1165

## COMPLAINT

Plaintiffs Westboro Properties LLC and Stonehurst Capital, Inc. (collectively "Plaintiffs")

bring this action against Defendants Canadian Imperial Bank of Commerce, CIBC Inc., CIBC World

Markets Corp. and CIBC Capital Corp.(collectively "CIBC" or "Defendants").

### I.
### Parties

1.    Westboro Properties LLC is a Delaware limited liability company with its principal

place of business in Rochester, New York. Both plaintiffs are herein collectively referred to as

"Plaintiffs."

2.    Stonehurst Capital, Inc. is a Delaware corporation with its principal place of business

in Rochester, New York.

3.    Canadian Imperial Bank of Commerce is a Canadian bank with its United States

principal place of business in New York, New York. All defendants are herein collectively referred

to as "Defendants" or "CIBC."

CK20178

4.      CIBC Inc. is a Delaware corporation with its principal place of business in New York City, New York.

5.      CIBC World Markets Corp. is a Delaware corporation and is a resident of the state of Delaware.

6.      CIBC Capital Corp. is a Delaware corporation and is a resident of the state of Delaware.

## II.
## Jurisdiction & Venue

7.      The Court has jurisdiction over the parties and subject matter of this cause, and has jurisdiction to grant all relief requested by Plaintiffs.

8.      The amount in controversy is within the jurisdictional limits of this Court.

9.      A related action is pending in the Southern District of Texas, but a court-order stay prevents amendment of the pending complaint; this new action must, therefore, be filed.

10.     Venue is proper in the Southern District of Texas because a substantial part of the events or omissions giving rise to the claims occurred in Galveston County, Texas, and similar actions have been consolidated in the Southern District of Texas.

## III.
## Nature of the Case

11.     This action seeks equitable and/or monetary relief pursuant to the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581-1 et seq., (the "Texas Blue Sky Laws"), the Texas Business & Commerce Code section 27.01 (statutory fraud), and the Texas common law of fraud, conspiracy, aiding and abetting, negligence, and all other claims applicable under statutory and common law of the State of Texas.

12.     This suit arises out of CIBC's wrongful acts and omissions in aiding and abetting Enron in defrauding Plaintiffs. CIBC, for its own pecuniary gain, wrongfully and purposely concealed Enron's true financial condition to the detriment of Plaintiffs and other investors in Enron securities.

13.     CIBC helped devise and implement complex sham transactions to mask hundreds of millions of dollars of debt that Enron was accumulating. These complex transactions served no legitimate business purpose; their sole function was to allow Enron to overstate its income and hide its debt. CIBC, after making profits on the transactions, then attempted to foist the ultra-high risk debt upon unsuspecting investors.

14.     CIBC, pursuant to banking regulations and in accordance with its own internal procedures, was required to carefully scrutinize and analyze the risks involved in the transactions. CIBC's top executives knew Enron's true financial condition, knew that the inaccurate financial reports furnished to the public by Enron were false and misleading, and knew that their participation in the sham transactions aided and abetted Enron to perpetrate its fraud. Nonetheless, even as Enron's stock price was plunging and the manipulative sham deals were beginning to come to light, CIBC never made its knowledge and wrongful involvement in Enron's Ponzi scheme known to Plaintiffs or to the investing public. Indeed, CIBC's investment arm throughout the relevant period portrayed Enron as a financially sound, well-managed company, and recommended to Plaintiffs and other investors the purchase of Enron securities, even as Enron was descending into bankruptcy.

15.     CIBC made huge profits as a result of its wrongful conduct while the Plaintiffs suffered staggering losses. Plaintiffs, by their lawsuit, seek to recover losses caused by CIBC.

**IV.**
**Facts**

16.     CIBC is a full service financial institution operating primarily in Canada and the United States, and also operating in the West Indies, Europe and Asia. CIBC is the fifth largest bank in Canada and ranked, by assets, among the ten largest banks in North America as of July 31, 2001.

17.     Enron originally was an energy company with operations focused in the natural gas industry. In the early 1990's, Enron launched an ambitious and aggressive program of diversification and expansion which included numerous acquisitions and entering into new areas of business. The energy business at the time was undergoing major changes as a result of the trend toward deregulation of energy utilities. Enron's expansion plans were capital intensive and required billions of dollars to be raised from debt and equity issues.

18.     CIBC had a long and close relationship with Enron, providing both investment and commercial banking services. CIBC investment bankers interacted and worked closely with Enron's top executives.

19.     CIBC acted as an underwriter for a number of Enron public offerings.

20.     In November 1993, CIBC participated as an underwriter for an offering of Enron preferred shares.

21.     In July 1994, CIBC participated as an underwriter for an offering of Enron preferred shares.

22.     In January 1997, CIBC participated as an underwriter for an offering of Enron preferred shares.

23.     In May 1998, CIBC participated as an underwriter for an offering of Enron common shares.

24.     In February 1998, CIBC participated as an underwriter in an offering of Enron common shares.

25.     In May 1999, CIBC participated as an underwriter in an offering of 7.375% Enron notes.

26.     CIBC also participated in credit facilities that enabled Enron to borrow billions of dollars.

27.     As a result of CIBC's close working relationship with Enron officers, the information gained from participation as an underwriter for Enron securities, and the information gained from participating in Enron's lending facilities, CIBC had an extensive and intimate knowledge of Enron's true financial condition.

28.     By 1998, Enron's actual performance began lagging stock analysts' predicted performance. Enron needed increasingly large amounts of "fresh" money to pay off old debts, cover losses and finance ongoing operations.

29.     To avoid the necessity of publicly announcing disappointing financial results, Enron and CIBC engaged in a Ponzi scheme aimed at hiding debt and increasing reported revenue.

30.     The fraudulent Ponzi scheme would work, and continue to work, only if Enron maintained an investment-grade credit rating, which in turn depended upon financial reports indicating strong current results and containing optimistic financial forecasts.

31.     CIBC aided Enron in cooking its books by participating in transactions that were devised and implemented, and that CIBC knew at all times were devised and implemented, for the

purpose of allowing Enron to falsely report strong financial results.  In further aid of the fraudulent scheme, CIBC issued a series of analyst reports which CIBC knew  contained false information about Enron's financial condition and which recommended to the public that Enron securities were a sound investment.

32.    CIBC participated in the fraudulent scheme for a simple reason:  Money.  CIBC's participation in Enron's financial shenanigans brought CIBC millions of dollars in fees and interest. CIBC wanted to be one of Enron's top banking relationships.

33.    Enron rated financial institutions according to a tier system based on a variety of factors, including the ability and willingness of the institution to engage in large, complex transactions in rapid fashion.  Enron routed its most attractive and lucrative business to institutions it had rated as "Tier 1."

34.    By 1998 CIBC had engaged in a number of significant, complex financial transactions with Enron and earned substantial fees, but had not attained Tier 1 status, which it desired to do. Several meetings were held between Enron and CIBC senior management, during which Enron set out parameters for CIBC to meet in order to achieve Tier 1 status.

35.    As a part of its effort to achieve Tier 1 status, CIBC aided and abetted Enron's fraud by participating in a number of multi-million dollar transactions that concealed Enron liabilities and allowed Enron to report false income.

36.    These transactions had no legitimate business purpose.  The only purpose of the transactions was to allow Enron to falsely report positive financial results in SEC filings and to inaccurately state Enron's financial condition in various other financial reports.

#159768 v1 - OSPREY-CIBC-Complaint                6

37.    CIBC was involved in implementing and using partnerships and/or special purpose entities (together, "SPEs") and other sham transactions to aid Enron in its scheme.  The SPEs and their associated transactions were vehicles employed to hide liabilities by keeping liabilities "off the books" of Enron, thus allowing Enron and CIBC to report that Enron had a higher net worth, and much greater profits, than actually were the case.

38.    Many of these transactions were termed "FAS 125," and later "FAS 140," transactions, so named for the accounting loophole that was supposed to make the accounting treatment of the transactions appear "legitimate."

39.    In addition to disguising the debt, the structures were used by CIBC and Enron to enable Enron to re-characterize loan proceeds as "cash flow from operations," thereby further overstating the health and financial condition of Enron's underlying business operations.  CIBC knew that these transactions did not meet the accounting criteria for "off the books" treatment because the transactions had no legitimate business purpose.  CIBC also knew that the transactions and accounting practices employed were improper because Enron had complete control of the SPEs.

40.    CIBC admitted, in agreement with the United States Department of Justice, that beginning in 1998, CIBC engaged in a series of FAS 125/140 transactions with Enron, knowing that Enron's purpose in entering into these transactions was to improperly remove assets from its balance sheets and book earnings and/or cash flow at quarter and year-end.

41.    In two FAS 125/140 transactions between June 1998 and September 1998 (named Riverside 3 and 4, which monetized interests in Tecaside Power Holdings Limited), CIBC and Enron entered into contemporaneous unwritten understandings that CIBC, as agent for the lender group in

the case of Riverside 4, and Bankers Trust, as agent for the lender group in the case of Riverside 3, would demand repayment, and thereby terminate the transaction on agreed-upon or definable terms, at the earlier of the alternative maturity dates specified in the documents. In three FAS 125/140 transactions between January 1999 and March 2000, CIBC understood that the transaction would be terminated prior to the stated maturity date. These transactions involved projects named Riverside 5 (monetization of interests in Tecaside Power Holdings Limited), Project Discovery (monetization of shares and warrants of First World Communications, Inc.) and Project Ghost/Specter (monetization of shares of Rhythms NetConnections, Inc.).

42.    In these transactions, overpriced Enron assets were "sold" to unwary investors. Because of the nature of FAS 125/140 private placements, CIBC had a duty to perform due diligence and inform investors accurately and completely about the details of the investment. CIBC, however, completely ignored its obligations to investors.

43.    As a result of these transactions, Enron was able to falsify its reported financial condition.

44.    CIBC has expressly admitted, in its agreement with the United States Department of Justice, its wrongdoing in connection with these FAS 125/140 transactions.

45.    In 1999, Enron solicited CIBC to become the three percent minority "equity" holder in FAS 125/140 transactions as well as to provide the lucrative debt component of the transaction. In order for such a transaction to be properly taken off -balance sheet, at least 3% of the financing had to be from an independent equity source that was truly at risk.

46.    CIBC provided the "equity" stake only because Enron's senior management first orally promised CIBC that the "equity" would be repaid at or before maturity at par plus an agreed-

upon yield.   CIBC sought and obtained such promises from Enron's senior management in connection with its three percent equity investment in Projects Leftover, Nimitz, Alchemy, Discovery and Hawaii 125-0.

47.    CIBC knew that the oral promises made the transactions ineligible for off-balance sheet treatment, and also knew that Enron would and did treat the transactions off-balance sheet.

48.    CIBC expressly admitted, in its agreement with the United States Department of Justice, its wrongdoing in connection with these "minority equity stake" transactions.

49.    In early 2000, after CIBC had proved to Enron that CIBC was willing and able to participate in Enron's fraud, Enron awarded CIBC Tier 1 status.

50.    Both before and after achieving Tier 1 status, CIBC participated in various fraudulent transactions to aid Enron cook its books.   CIBC profited handsomely by collecting exorbitant fees and above-market rate interest from Enron.

51.    CIBC was also rewarded for its efforts by being allowed to participate as a partner in LJM2.   Through its subsidiary CIBC Capital, CIBC was one of the pre-funding partners of LJM2. The promised returns were over three times the market rate of return.

52.    The story of LJM2 has been well publicized and epitomizes the fraudulent and conspiratorial relationship between Enron and Enron's top investment banks, including CIBC.

53.    The LJM2 SPE was structured and created in late 1999 as a vehicle for hiding Enron liabilities and allowing Enron to report strong earnings in its year-end financial reports.

54.    Run by Enron's Chief Financial Officer Andrew Fastow, LJM2 was used to complete a number of year-end "deals" which boosted Enron's reported profits. Enron "sold" a number of "assets" – assets that Enron had been unable to sell to legitimate, bona fide buyers – to the LJM2

entity. This mixed bag of essentially unmarketable assets included, among other things, majority interests in a Polish power plant and an interest in a Gulf of Mexico natural gas system. Enron reported a profit on the sales of these assets to LJM2. Later, Enron repurchased the assets.

55.    CIBC invested in the clandestine SPE knowing it was controlled by Enron and was devised to facilitate the phony sales of overvalued Enron assets. LJM2 allowed Enron, with CIBC's help, to deceive investors by moving worthless assets and debt off Enron's balance sheet, for the purpose of artificially inflating the value of Enron securities.

56.    "Select investors" were often promised annual returns of 30% on LJM2 investments. This group of select investors included CIBC.

57.    CIBC knew from the start that the structure, the purpose, and Enron's control of LJM2 was improper. LJM2 was devised to purchase assets from Enron. Andrew Fastow, Enron's Chief Financial Officer, controlled and owned (along with his Enron subordinate Michael Kopper) the entity set up by Fastow to be LJM2's general partner. Fastow, accordingly, was charged both with LJM2's management and investment decisions, and with conflicting obligations to pursue and protect Enron's interests.

58.    The inherent conflict of interest between Fastow's role as representative of LJM2's investors and his role as an Enron officer was obvious. CIBC nonetheless decided to participate in LJM2.

59.    Various investigations and reports, such as reports from Enron's Bankruptcy Examiner, concluded that the LJM2 disclosures were obtuse, did not communicate the essence of the transactions completely or clearly, and failed to convey the substance of what was transpiring.

60.    Andrew Fastow pleaded guilty in 2004 to criminal charges arising from the fraud perpetrated by Enron.

61.    As long as the Ponzi scheme continued, CIBC could continue collecting fees from Enron as a result of the sham transactions designed to hide Enron's debt.

62.    In retrospect, it is now plain that Enron's scheme was aided by CIBC analyst reports. These reports contained false information about Enron's true financial condition, including reports issued July 15, 1998, October 14, 1998, January 25, 1999, April 14, 1999, July 14, 1999, October 7, 1999, October 13, 1999, January 6, 2000, January 1, 2000, January 21, 2000, April 12, 2000, October 19, 2000, April 19, 2001, August 15, 2001 and October 17, 2001. CIBC falsely portrayed Enron as a well-managed, financially sound company.

63.    CIBC, however, took steps to avoid the risk of a possible – or probable - Enron collapse by shifting the risk to the owners of Enron stocks and bonds and to other investors who were advised by CIBC and other banks to invest in the sham transactions.

64.    By mid-2001, Enron's stock price was in a steady decline and questions about Enron's operations and accounting methods had surfaced in the media. CIBC did not want to lose its Tier 1 status and its very profitable Enron business, and therefore did not publicly reveal that it aided Enron in various fraudulent transactions. Its investment advisory departments or subsidiaries continued to recommend the purchase of Enron securities.

65.    In mid-October 2001, The Wall Street Journal published a series of articles about Enron's improper accounting treatment of "structured" partnerships and special purpose entities. Enron soon thereafter announced that it would have to restate its financial results.

66.   In spite of a continuing stream of public revelations in the media concerning Enron's accounting gimmicks, and despite CIBC's knowledge of Enron's true financial condition and participation in LJM2, CIBC kept recommending the purchase of Enron securities.

67.   Thus, even as Enron was crumbling, CIBC falsely continued to portray Enron as a highly efficient, well managed and financially sound company.

68.   Enron descended into bankruptcy December 2, 2001.

69.   Plaintiffs purchased and held Enron-related securities based upon information that was false as a result of CIBC's conduct.

70.   Plaintiffs relied upon Enron's financial statements that were made false by CIBC's conduct when Plaintiffs purchased Osprey Trust certificates in 1999 and 2000.

71.   Osprey certificates were privately placed securities.

72.   Plaintiffs did not learn of CIBC's fraudulent role in Enron's demise until late 2003 when CIBC admitted wrongdoing to the U.S. Department of Justice.

73.   Plaintiffs also did not learn of CIBC's role in LJM2 until long after Enron's bankruptcy filing because initial reports indicated that CIBC executives in their individual capacities, rather than CIBC and its entity subsidiaries, were participants in the SPE.

74.   Plaintiffs seek monetary and/or equitable relief from CIBC for the harm suffered as a result of CIBC's wrongful conduct.

75.   Plaintiffs are entitled to relief because CIBC has expressly admitted that it knew that the purpose of the FAS 125/140 transactions and minority interest transactions was to remove assets from its balance sheets and improperly book earnings and/or cash flow.

76.    Plaintiffs are entitled to relief because CIBC aided Enron in promulgating false information about Enron's finances to Plaintiffs.

77.    Plaintiffs are entitled to relief because CIBC knew, but purposely and/or recklessly disregarded, that the SPEs and other transactions were shams, that employees and officers of Enron had interests in and control over the SPEs, that the FAS 125/140 and other "off balance sheet" transactions improperly hid Enron's true financial picture from investors, and that the SPEs and the other transactions should have been reported in Enron's consolidated financial reports.

## V.
## Causes of Action[1]

78.    The factual allegations in the above-numbered paragraphs are hereby incorporated by reference into each cause of action.

## VIOLATIONS OF THE TEXAS SECURITIES ACT

79.    CIBC is liable to Plaintiffs for violating the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581-1 et seq., in particular Article 581-33.

80.    CIBC and Enron both solicited to sell, offered to sell, attempted to sell, and did sell Enron and Enron-related securities.

81.    CIBC's pronouncements and recommendations materially misrepresented or failed to disclose numerous material facts.

---

1 To the extent the Court determines Texas law does not apply to Plaintiffs' common law claims, Plaintiffs assert corresponding common law claims under the controlling state law.

82.   CIBC violated, conspired to violate and/or materially aided and abetted violations of Article 581-33 by making untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

83.   In particular, CIBC purposely aided Enron in making false and misleading statements, and material omissions about Enron's financial condition in SEC filings and other Enron financial reports, for the purpose of perpetrating fraud.  Further, rather than attempting to correct these misrepresentations by promulgating information to make the false statements and omissions true, CIBC continued to conceal the true nature of the fraudulent transactions and to recommend purchase of Enron securities until Enron's collapse.

84.   CIBC's fraudulent conduct is confirmed by its admissions made in an agreement with the U.S. Department of Justice.

85.   Plaintiffs, purchasers and holders of Enron-related securities, relied upon the false Enron financial statement CIBC aided in creating,  suffered substantial damages and are thus entitled to relief by reason of CIBC's misrepresentations and omissions and by CIBC's aiding and abetting Enron's fraud, in violation of Article 581-33(f) of the Texas Securities Act.

### STATUTORY FRAUD IN STOCK TRANSACTIONS

86.   In addition or in the alternative, CIBC is liable to Plaintiffs for violation of section 27.01 of the Texas Business & Commerce Code.

87.   CIBC violated, conspired to violate, aided and/or materially abetted violations of section 27.01 by making, and aiding and abetting the dissemination of, false representations of past

or existing material facts or omitting to state past or existing material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.    Such false representations were made for the purpose of inducing Plaintiffs to enter into contracts for the purchase, and inducing Plaintiffs to keep holding, of the Enron-related securities in question.   Plaintiffs relied upon such false representations in entering into such contracts.

89.    CIBC and Enron both conspired to:  (a) make such false representations knowingly and with actual awareness of the falsity thereof, and/or; (b) (i) had actual awareness of the falsity of the representations made by CIBC, (ii) yet failed to disclose the falsity of the representations, and (iii) benefited from the false representations.

90.    CIBC's fraudulent conduct is confirmed by its admissions made in an agreement with the U.S. Department of Justice.

91.    Plaintiffs suffered substantial damages as a result.

### FRAUD

92.    In addition or in the alternative, CIBC is liable to Plaintiffs for fraud (including fraud in the inducement, fraud in the transaction, conspiracy to defraud, aiding and abetting a fraud, and fraudulent concealment).

93.    CIBC engaged in fraud by:  (a) employing devices, schemes, conspiracies and artifices to defraud; (b) making untrue statements of material facts or omitting to state material facts necessary to make the statements made in light of the circumstances under which they were made not misleading; and/or (c) engaging in acts, practices and a course of business which operated as a fraud

or deceit upon Plaintiffs in connection with their purchases of, and decisions to hold, Enron securities.

94.     CIBC employed schemes whereby it first participated in the concealment of Enron's true financial condition and then recommended the purchase of Enron securities based upon the false information it had created.  By directing and promulgating the false statements to Plaintiffs and other investors, and/or by conspiring with Enron to direct and promulgate false statements to Plaintiffs and other investors, CIBC embarked upon a course of conduct which operated as a fraud upon Plaintiffs.

95.     CIBC knew and/or recklessly disregarded the fact that the complained-of acts, practices, misleading statements and omissions would adversely affect the integrity of the market for both Enron and Enron-related securities and would artificially inflate the price of such securities. Had the adverse facts that CIBC concealed and aided Enron to conceal been disclosed, Plaintiffs would not have purchased, and would not have continued to hold, Enron-related securities.

96.     CIBC conspired with, and aided and abetted, Enron to commit fraud.  CIBC and Enron engaged in a common course of action aimed at falsifying Enron's reported financial condition by numerous overt acts.

97.     CIBC knew that its participation was a material part of Enron's fraud.  CIBC knew, even independently from its own fraudulent acts, from reports in the media and the financial news services, that the asset-hiding SPEs were part of a massive scheme to cook Enron's books.  The peculiar structure of the SPEs and the other sham transactions, furthermore, clearly implicated Enron's questionable accounting practices.  CIBC's inside information concerning the SPEs and the other sham transactions demonstrates that CIBC purposely, knowingly and fraudulently ignored Enron's fraudulent accounting practices.

98.  As a result of CIBC's fraudulent concealment of material facts, Plaintiffs were unaware that Enron-related securities should not be purchased and that the Enron-related securities in their portfolios should have been sold.

99.  In ignorance of the false and misleading nature of CIBC's various fraudulent activities, Plaintiffs relied to their detriment on the Enron mis-representations CIBC created.

100.  The value of the securities purchased by Plaintiffs declined materially upon the final public disclosure of the true and material facts which had been misrepresented or concealed.

101.  Plaintiffs suffered substantial harm as a result of CIBC's fraudulent conduct and are entitled to damages and/or equitable relief.

102.  CIBC, in pursuance of a common plan or design to commit a tortious act, took part in it, or furthered it by cooperation or request, or lent aid or encouragement to Enron's fraud, or ratified or adopted Enron's wrongful acts done for its benefit, is equally liable with Enron and other participants of the conspiracy.

103.  CIBC is liable for harm caused by Enron's fraud because (a) CIBC did a tortious act in concert with Enron and with others pursuant to a common design with Enron; (b) CIBC knew that Enron's conduct was wrongful and that the conduct of others in aiding Enron was wrongful; (c) CIBC gave substantial assistance in accomplishing the tortious result.

104.  CIBC engaged in civil conspiracy because (a) CIBC and at least one other party; (2) set out to allow Enron to disseminate false financial information; (3) there was a meeting of the mind between Enron and CIBC; (4) there was at least one overt act in furtherance of the conspiracy and (5) damages proximately resulted.

105.  Plaintiffs were harmed by each of Defendant's conduct.

## NEGLIGENCE AND PROFESSIONAL MALPRACTICE

106.   In addition or in the alternative, CIBC is liable to Plaintiffs as a result of CIBC's common law negligence and professional malpractice.

107.   CIBC held itself out as an analyst and underwriter that could be trusted.

108.   CIBC is knowledgeable of its duty to provide true and accurate information.  CIBC, therefore, must be held to a standard of care commensurate with the duties imposed by its profession.

109.   The complained-of conduct fell far short of the required standard of care for securities brokers and securities underwriters.  Further, and in any event, CIBC's conduct was so outrageous that it breached even a minimal standard of care.

110.   Plaintiffs were harmed by CIBC's breach of its duty of care and are entitled to damages.

111.   CIBC, moreover, exhibited such an entire want of care as to indicate that the acts and omissions in question were the result of conscious indifference to the rights and/or welfare of Plaintiffs and other persons affected by them so as to constitute gross negligence.  Plaintiffs are therefore entitled to an award of exemplary or punitive damages.

## VI.
## Prayer

112.   Plaintiffs pray that CIBC be cited to appear and answer herein, and that upon trial of this cause, judgment be rendered for Plaintiffs as follows:

      a.      All direct, consequential, special and punitive damages;

      b.      All equitable relief to which they may be entitled;

      c.      Attorneys' fees and legal expenses (including expert fees);

      d.      Pre-judgment and post-judgment interest; and

    e.      Costs of court.

113.  Plaintiffs further pray for general relief and such other and further monetary or equitable relief to which they may be entitled.

114.  Plaintiffs demand trial by jury.

Respectfully submitted,

GREER, HERZ & ADAMS, L.L.P.

By: _____

    Andrew J. Mytelka
    State Bar No. 14767700
    Attorney in Charge
    John S. McEldowney
    State Bar No. 13580000
    Joe A.C. Fulcher
    State Bar No. 07509320
    M. David Le Blanc
    State Bar No. 00791090
    Steve Windsor
    State Bar No. 21760650
    One Moody Plaza, 18th Floor
    Galveston, Texas  77550
    (409) 797-3200
    (409) 766-6424 (FAX)

ATTORNEYS FOR PLAINTIFFS

# CIVIL COVER SHEET

JS 44 (Rev. 3/99)

The JS-44 civil cover sheet and the information contained herein neither replace no supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of intiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

WESTBORO PROPERTIES, LLC;
STONEHURST CAPITAL, INC.

**(b)** County of Residence of First Listed Plaintiff <u>Boston, MA</u>
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Andrew J. Mytelka, Greer, Herz & Adams, L.L.P.
One Moody Plaza, 18th Floor
Galveston, Texas 77550
(409) 797-3200

**DEFENDANTS**
Canadian Imperial Bank of Commerce; CIBC Inc; CIBC World Markets Corp.; and CIBC Capital Corp.
County of Residence of First Listed Defendant:
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

United States Courts
Southern District of Texas
FILED

Attorneys (If Known)

H-05-1165

APR - 4 2005

Michael N. Milby, Clerk

| **II. BASIS OF JURISDICTION** (Place an "X" in One Box Only) | | **III. CITIZENSHIP OF PRINICPAL PARTIES** (Pace an "X" in One Box for Plaintiff and One Box for Defendant) | | | | |
|---|---|---|---|---|---|---|
| | | (For Diversity Cases Only) | PTF | DEF | | PTF DEF |
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4  ☐ 4 |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5  ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6  ☐ 6 |

**IV. NATURE OF SUIT** (Place and "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal 28 USC | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury – | of Property 21 USC 881 | 157 | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| Overpayment & Enforcement | Slander | ☐ 368 Asbestos Personal | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt |
| of Judgment | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs | ☐ 830 Patent | Organizations |
| ☐ 151 Medicare Act | Liability | | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☒ 850 Securities/ |
| Student Loan (Excl Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Commodities/Exchange |
| ☐ 153 Recovery of | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| Overpayment of Veteran's | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| Benefits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 160 Stockholders' Suits | Product Liability | ☐ 385 Property Damages | Act | ☐ 863 DIWC/DIWW | ☐ 893 Environment Matters |
| ☐ 190 Other Contract | ☐ 360 Other Personal | Product Liability | | (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 195 Contract Product | Injury | | ☐ 720 Labor/Mgmt Relations | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| Liability | | | | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt | | Determination Under Equal Access to |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | Reporting & Disclosure Act | **FEDERAL TAX SUITS** | Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence Habeas Corpus. | ☐ 740 Railway Labor Act | | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | Accommodations | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐ 871 IRS – Third Party | |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | ☐ 791 Empl Ret Inc | 26 USC 7609 | |
| | | ☐ 555 Prison Condition | Security Act | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**VI. CAUSE OF ACTION** (Cite the U S Civil Statute under which you are filing and write brief statement of cause  Do not cite jurisdiction statutes unless diversity )
Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581 – 1 et seq.; Texas Business & Commerce Code section 27.01 and various common law claims.

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F R C P 23   DEMAND approx. $14 million CHECK YES only if demanded in compliant:

JURY DEMAND ☒ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions)
Mark Newby v. Enron Corp., et al; Consolidated Lead No. H-01-3624

JUDGE  Judge Melinda Harmon   DOCKET NUMBER  H-01-3624

DATE  1 April 2005   SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____